OPINION
Defendant-appellant, BP Oil, Inc., appeals from the judgment entry of the Hancock County Court of Common Pleas awarding damages to plaintiff-appellee, Lakewood Homes, Inc., arising from BP Oil's clearing of its right-of-way easement on Lakewood Homes' property. Lakewood Homes has filed a cross-appeal.
Lakewood Homes owns three parcels of real property on State Route 12 East in Hancock County previously owned by Loren Palmer, Lakewood Homes' president. In 1967, Palmer purchased the center parcel which served as a residence for Palmer. The east parcel of an acre and a half on which the modular home business is located was purchased in late 1968. The third parcel acquired in 1971 is where Palmer now resides and included a wooded area. BP Oil is the succeeding owner of the pipeline right-of-way easement across the property now owned by Lakewood Homes. The original grant of this easement was executed in 1937 by Martha Morrell, Lakewood Homes' predecessor in title, to The Standard Oil Company, BP Oil's predecessor in title.
The 1937 document which created the pipeline right-of-way grant now held by BP Oil provided "the right to lay, maintain, operate, repair, replace and remove a pipe line and all necessary fixtures, equipment and appurtenances thereto, over, through and across" said premises. The document also contained the following two paragraphs:
 Said Grantor, and Grantor's heirs and assigns, reserve the right fully to use and enjoy the said premises except insofar as such use and enjoyment shall be inconsistent with the exercise by the Grantee of the rights herein granted to it. The Grantee, by the acceptance hereof, agrees to bury said pipe line so that it will not interfere with the cultivation of the land and also to pay any damage to crops, buildings, fences and timber arising from the exercise by the Grantee of any of the rights herein conferred upon it. Grantee further agrees to pay any damage to soil done by construction or operation of said pipe line.[1]
 And it is further agreed by the undersigned that said Grantee, its successors or assigns, shall have the right, at any time, * * * to lay, maintain, operate, repair, replace and remove additional pipe lines over and through said premises * * *.
In 1939, an eight-inch pipeline was installed by virtue of the pipeline right-of-way grant. A second pipeline was installed in early 1950. In late 1970 or early 1980, the first pipeline was reconditioned, which required digging up said pipeline and then reinstalling it in the ground. BP Oil compensated Lakewood Homes for the cutting down of four or five trees and the loss of some evergreen trees when the pipeline was reconditioned.
Subsequently, in March 1995, BP Oil notified Lakewood Homes that a clearing of the right-of-way on its property was necessary. This action arose out of the clearing activities BP Oil or its contractor engaged in upon the property. In its complaint against BP Oil, Lakewood Homes sought, inter alia, damages to real estate and timber. Lakewood Homes thereafter also sought a declaratory judgment with respect to the scope of the easement rights. Before trial, the parties reached an agreement on a metes and bounds description to define the area of the easement as recited in the trial court's judgment entry filed July 17, 1998. Also through the court's entry, the parties agreed that the matter would proceed to a trial to the court on the "issue of determining the measure of damages applied to the cutting and side trimming of trees on Lakewood Homes' property under the terms of the pipe line right-of-way dated April 28, 1937."
A bench trial was then held on July 20, 1998. Thereafter, the trial court issued a judgment entry finding for Lakewood Homes on its complaint since the "pipeline right-of-way easement provides for compensation to [Lakewood Homes] for items including `timber' arising from the exercise by the Grantee of any rights under the easement." After considering that Webster's Dictionary defines the word "timber" as meaning "growing trees or their wood," the trial court found that the term "timber" as used in the right-of-way encompassed all of the trees which were removed or trimmed as a result of BP Oil's exercise of its rights under the right-of-way grant. The court entered judgment in favor of Lakewood Homes and against BP Oil in the amount of $15,474.
BP Oil now appeals from the trial court's judgment and raises two assignments of error. For its first assignment of error, BP Oil asserts:
 The trial court erred as a matter of law in failing to apply the unambiguous language of the easement and determining that BP Oil was liable for damages under its 1937 pipeline right-of-way for removing and trimming trees growing within this easement.
BP Oil argues that after the original construction of the pipeline, it had the uninhibited right under the terms of the easement right-of-way to remove trees, vegetation and overhang from its right-of-way for aerial inspection and access by maintenance crews without compensating Lakewood Homes.[2]
An easement has been defined as an interest in the land of another which entitles the owner of the easement to a limited use of the land in which the interest exists. Wray v. Wymer (1991),77 Ohio App.3d 122, 130, citing Szaraz v. Consol. Railroad Corp.
(1983), 10 Ohio App.3d 89, and 3 Powell on Real Property (1985), 34-10 et seq., Paragraph 405. The owner of the land may use the property in any way not inconsistent with the limited use permitted the easement owner, but the owner may not interfere with the easement owner's rights with respect to use of the easement.Colburn v. Maynard (1996), 111 Ohio App.3d 246, 253, citing 3 Powell on Real Property (1985) 34-15, Section 405. Similarly, it has been recognized that an easement holder may not increase the burden upon the servient estate by a new and additional use on such property. See Centel Cable Television Co. of Ohio, Inc. v.Cook (1991), 58 Ohio St.3d 8, 12. The language of the easement, considered in light of the surrounding circumstances, is the best indication of the extent and limitations of the easement. SeeApel v. Katz (1998), 83 Ohio St.3d 11, 17.
BP Oil submits Rueckel v. Texas Eastern Transm. Corp. (1981),3 Ohio App.3d 153 as authority to support its contention. InRueckel, the Fifth District Court of Appeals interpreted damage clauses in two rights-of-way which either required the grantee to pay damages "to stock, crops, fences, timber and land which may be suffered from the construction, operation, renewal, alteration, inspection or maintenance or such pipelines" or to pay damages which may arise "from the construction, maintenance and operation of said pipe * * *." The court found that the damage clause in both of these rights-of-way grants refers to the original construction of such pipelines and also for damages to stock, crops, fences, timber and land which occur as a result of the original construction thereon, and thereafter, only to those matters which do not interfere with the rights of the easement holder. Id. at 158-159. "The proper test would be to determine whether the existence of the object or activity within the rights-of-way, for which compensation is claimed, represents the exercise by the property owner of a retained property right or an infringement upon the easement-holder's rights." Id. at 159. Thus, the court determined that where a property owner unlawfully obstructs or interferes with the rights of an easement holder, including the right to engage in appropriate pipeline maintenance operations, then the holder of the easement rights has the authority to remove those obstructions without compensation to the land owner.
As stated above, the easement in the present case provided that the grantee agreed to "pay any damage to crops, buildings, fences and timber arising from the exercise by the Grantee of any of the rights herein conferred upon it." Like Rueckel, we find that the proper interpretation of the damage clause requires compensation after the original construction only in a situation where the landowner has not unlawfully obstructed or interfered with the easement holder's rights. This interpretation of the damage clause coincides with the principles governing the relative rights of the landowner and the easement holder. Indeed, the grant of the easement in this case prohibits the grantor and its successors from using the property inconsistent with the exercise of the rights of the easement holder.
However, we find that the circumstances in Rueckel are clearly distinguishable from this case. Here, the evidence indicates that the trees in question were planted before Lakewood Homes or its president began to occupy the property in 1967. In fact, there is evidence in this case of the average size being large, mature trees ranging from twenty and one-half inches to thirty-five inches in diameter. More important, it seems very unlikely that aerial inspection was contemplated at the time of the original grant of the easement involved in this case. As the appellate court wrote in Ashland Pipe Line Co. v. Lett (Apr. 11, 1990), Ashland App. No. CA-942, unreported, at *15, unreported, concerning aerial inspection:
 In analyzing the intent of the parties who signed the agreement in 1907, there is no doubt they did not anticipate needing fifty feet in order to install, inspect, and maintain the pipeline. Aeronautics was in its infancy. The Wright Brothers had flown at Kitty Hawk only three (3) years before. In fact, it is doubtful if either party involved in the original easements had ever seen an airplane. Aerial inspection could not have been contemplated. Moreover, the parties could not have anticipated the large equipment which would be used currently to lay and maintain the pipeline. The equipment illustrated in Plaintiff's Exhibit 12, which requires a fifty (50) foot easement in order to maneuver, could not have been fathomed by the parties. The trenches for pipeline laid in 1907 were probably dug with picks and shovels.
The fact that there has obviously been ongoing inspection and maintenance of the right-of-way over the course of many years with the mature trees at issue existing on the property also tends to show that aerial surveillance was not anticipated as the means of observing the pipelines.
BP Oil further argues that it is required by federal law to inspect its pipeline at least twenty-six times per year pursuant to the Federal Pipeline Safety Regulations and also that it may conduct these inspections by aerial surveillance. BP Oil therefore concludes that in order to conduct aerial surveillance of the pipeline across the property, the right-of-way must be cleared so that the pipelines can be inspected from the air. As such, BP Oil asserts that it has an "implied right" under the easement based on its duty imposed by federal law to clear any obstructions over the pipelines for purposes of inspection. While the testimony did show that BP Oil uses aerial surveillance to inspect the pipelines on a weekly basis, BP Oil did not present any evidence to the trial court that demonstrates that its maintenance and inspection could not be carried out in a manner which did not impose additional burdens on Lakewood Homes' servient property.
Thus, from the evidence in the record in the instant case, it is clear that BP Oil has widened the visible surface area beside its pipeline to permit aerial inspection thus imposing an additional burden upon Lakewood Homes' servient property. This is an added use for which damages must be paid. Consequently, BP Oil's first assignment of error is overruled.
For its second assignment of error, BP Oil asserts that:
 The trial court erred in rendering a judgment to Lakewood Homes pursuant to the 1937 easement for damage to timber based on a landscape and appraisal value.
BP Oil contends that the term "timber" in the damage provision was not ambiguous and means "wood of growing trees suitable for construction purposes." Its argument is based on the limited meaning of the term "timber" contained in 25 Ohio Jurisprudence (1932), 742, Logs and Timber, Section 2 and usage in the forestry industry. Thus, BP Oil contends that the appropriate measure of damages is the "timber" or "stumpage" value.
Lakewood Homes' cross-assignment also challenges the measure of damages and states as follows:
 The trial court committed error prejudicial to the cross-appellant by refusing to apply the cost of cure or restoration as the appropriate measure of damages to trees located within Lakewood's "woodlot" and his decision in such regard was against the manifest weight of the evidence.
In its cross-assignment of error, Lakewood Homes states that the trial court correctly applied the landscape value to the trees which were cut and pruned in the yard area, but argues that the trial court failed to utilize the appropriate measure of damages for those trees which were removed from the wooded lot adjacent to the yard area. Lakewood Homes argues that the trial court should have awarded it the cost of restoration for nine trees.
When interpreting the terms of an easement right-of-way, this court must follow the rules of contract construction "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Skivolocki v. East Ohio Gas Co.
(1974), 38 Ohio St.2d 244, 313 N.E.2d 374, paragraph one of the syllabus. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Alexander v. Buckeye PipeLine Co. (1978), 53 Ohio St.2d 241, paragraph two of the syllabus. Furthermore, extrinsic evidence of a general custom or trade usage cannot vary the terms of an express contract, but such evidence may be used to show that the parties to a written agreement intended to employ terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement. Id. paragraph three of the syllabus. "Usages and customs of a particular trade are not binding on a party who is not a member of a particular trade but who has simply entered into an agreement with a member of a trade, unless such party has actual knowledge of the usage or custom or has previously engaged in transactions in which the usage or custom was recognized." 92 Ohio Jurisprudence 3d (1989), Usages and Customs, Section 28.
The term "timber" is not defined in the easement right-of-way document. The trial court found that based upon the definition as found in the dictionary, the meaning of the term "timber" was "growing trees or their wood." The ordinary definition of the word "timber" is much broader than BP Oil's limited meaning of the word. Although the trial court was presented some competent, credible evidence that "timber" did have a specific meaning within the forestry industry, there was no testimony that the parties to the easement at issue were engaged in the forestry industry. Nor was there sufficient evidence presented to evince a custom or usage so widespread in the oil and gas industries to assume the parties had knowledge of the special usage and must have intended the limited meaning when they employed the term "timber" in the 1937 agreement. Indeed, we note that Lakewood Homes introduced the expert testimony of James Benroth, who had thirty years experience with pipeline right-of-way work. He opined that "timber" is synonymous with "trees."
In conclusion, we find no ambiguity in the term at issue and the trial court did not err by applying the ordinary meaning of this term.
The issue in the present matter then becomes whether the trial court applied the proper measure of damages to the cutting and pruning of trees on Lakewood Homes' property.
The purpose of compensatory damages is to fully compensate the injured party. Schuyler v. Miller (1990), 70 Ohio App.3d 290,292, citing Brady v. Stafford (1926), 115 Ohio St. 67, 79. The general "rule" for measuring damages for injury to real estate (diminution in fair market value of the property) should not be inflexibly applied without regard to whether its application would fully compensate the injured party. See Apel, supra, at 20. Thus, when the cut trees have been used for a specific purpose, such as a sound barrier and a screen from highway traffic, replacement cost is a proper measure of damages. Denoyer v. Lamb
(1984), 22 Ohio App.3d 136, 139. Shade and ornamental trees used for a specific, identifiable purpose would also be compensable.Id. However, recovery has been awarded even when the owner's personal use is neither specific nor measurable by commercial standards, and when the trees form a part of an ecological system of personal value to the owner. Id. at 139-140. The court further stated in its opinion that:
 Timber cut or to be cut for commercial purposes may be valued in several ways: "stumpage" is the value of the undisturbed timber standing or lying on the land; add to that the cost of felling and hauling, to find the value of the logs; add to that, again, all costs of manufacture, to obtain the value of the finished product. Those values, however, are important only to the owner who holds his land in order to exploit its timber. Stumpage is generally a much smaller amount than the cost of replacement or restoration. To limit an owner to stumpage, as the trial court did in the instant case, would be to enforce a timber harvest on the owner without consideration of his/her intended use and his/her real loss.
Id. at 140.
In the instant case, the evidence indicates that some of the trees cut and all of those trees pruned were located in the back yard adjacent to Palmer's residence on the property owned by Lakewood Homes. The back yard was mowed like a lawn. Palmer stated that these trees serve an aesthetic function and also since the residence is near a railroad, they were a buffer for noise. The record further indicates that the wooded area located to the west of the residence was characterized as a densely wooded, forest. This wooded area is approximately one hundred fifty to two hundred feet from the residence. Palmer stated that the corporation uses it for storage, but it mostly serves the function for future development.
Lakewood Home's expert witness, Stella Miller, who had twenty years of experience in the appraisal of tree damage or loss, testified about various methods for valuing the loss of trees, including the trunk formula and the cost of restoration. Miller explained that the criteria to be considered in determining what method would be appropriate include the size and location of the tree on the property, as well as exactly what had happened. She stated that the trunk formula should be employed for trees in a landscape situation where the area is taken care of and mowed and considered to be part of the yard. She further stated that restoration value is more appropriately utilized in situations where a wooded setting has been damaged and the intended use is not for harvest of timber, but for some other purpose. Miller also criticized timber value as a proper measure of damages in this instance.
Miller computed the value of the cut trees in the back yard area using the trunk method to be $9,497. Using such method, she also computed the value of the loss to the side-pruned trees in the yard was $4,626. Miller testified that, given the age of the trees, it was not likely that they could recover from their major pruning. Miller further opined that the yard trees would not typically be harvested because of the risk of harm to the sawmill equipment from having foreign objects in the wood.
Miller also testified as to the cost of restoring the wooded area damaged by BP Oil. She testified that this amounted to $9,000. Miller explained that she utilized the replacement cost of nine trees, being a conservative number. In all, Miller identified eighteen trees cut down and nine trees side-pruned.
Lakewood Homes' other expert, James Benroth, confirmed the usual and customary practice in the pipeline industry is to consider the owner's use of the land in settling damage claims to trees as a result of pipeline operations.
BP Oil's expert, Steve Siam, a private consulting forester, testified to the timber value of the trees cut on the property. It was his testimony that a tree needed to be a minimum of twelve inches diameter at chest height with the capacity to produce at least an eight-foot log to be considered timber. Siam determined eighteen trees had timber value in the total range of $1,250 to $2,182. His opinion of timber value is based on the board foot volume, as well as market conditions, and the price by species.
The $15,474 damages award by the court consists of $14,123 for the value of the yard trees removed or pruned using the trunk formula and $1,351 for the value of the woodlot trees based upon the cut timber value. It is uncertain upon what basis the trial court suddenly rejected the restoration cost formula for the wooded lot after expressly accepting the testimony of Lakewood Homes' expert witnesses as to the measure of damages in all other respects. While the BP Oil witness testified as to the cut timber value of the trees in the wooded lot, no opinion was expressed to controvert the testimony of Lakewood Homes' experts to the effect that restoration cost was the appropriate measure of damages in this situation. Nevertheless, inasmuch as the trial court did have before it at least some competent, credible testimony in support of an alternative valuation for the damage to the wooded lot, we are not inclined to find either an abuse of discretion in the trial court's exercise of its prerogative to accept part or all of the testimony presented at trial or that the trial court's final judgment on the matter was against the weight of the evidence.
Based on the foregoing, we overrule BP Oil's second assignment of error and Lakewood Homes' cross-assignment of error. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
HADLEY, J., concurs.
WALTERS, J., concurs in judgment only.
[1] This sentence was handwritten in the original document.
[2] Lakewood Homes asserts that BP Oil has waived any challenge to Lakewood Homes' entitlement to some damages for the loss of its trees. In that BP Oil argued its position at trial that there were no damages under the terms of the easement and that the trial court's decision does interpret the damage clause in the easement, Lakewood Homes' argument is not well taken.